STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

19-639


STATE OF LOUISIANA

VERSUS

MICHAEL CALVIN DUHON



\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 164436
HONORABLE MARILYN C. CASTLE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**PHYLLIS M. KEATY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Phyllis M. Keaty, and John E. Conery, Judges.


**CONVICTIONS AFFIRMED. SENTENCES VACATED
AND REMANDED WITH INSTRUCTIONS.**

**Keith A. Stutes**
**District Attorney**
**Robert L. Odinet**
**Assistant District Attorney**
**Post Office Box 3306**
**Lafayette, Louisiana  70502-3306**
**(337) 232-5170**
**Counsel for Appellee:**
     **State of Louisiana**

**Meghan Harwell Bitoun**
**Louisiana Appellate Project**
**Post Office Box 4252**
**New Orleans, Louisiana  70119**
**(504) 470-4779**
**Counsel for Defendant/Appellant:**
     **Michael Calvin Duhon**

**Michael Calvin Duhon**
**In Proper Person**
**E.H.C.C. B1-B-#10 Cell**
**Post Office Box 174**
**St. Gabriel, Louisiana  70776**
     **Defendant/Appellant**

**KEATY, Judge.**

Defendant appeals his convictions of and sentences for theft and money laundering. For the following reasons, Defendant's convictions are affirmed; however, his sentences are vacated, and the case is remanded for resentencing with instructions.

## FACTS & PROCEDURAL BACKGROUND

In this criminal matter, Defendant, Michael Calvin Duhon, stole more than $400,000.00 in land and retirement funds from the victim, Marie Dutsch. Defendant's theft involved a complex financial scheme whereby he moved the money through shell corporations and different bank accounts to conceal the funds' source. As a result, Defendant was charged by bill of information with one count of theft over $25,000.00 in violation of La.R.S. 14:67, one count of money laundering in violation of La.R.S. 14:230(B)(5) and (E)(4), and one count of exploitation of the infirmed in violation of La.R.S. 14:93.4. Following a jury trial in February 2019, Defendant was acquitted of the charge of exploitation of the infirmed but found guilty regarding the remaining two offenses. For each offense, the trial court sentenced Defendant to serve fifteen years at hard labor to run concurrently, with all but eleven years suspended. He was placed on active supervised probation for three years subject to certain conditions. Defendant is now before this court appealing his convictions and sentences.

On appeal, Defendant asserts the following assignments of error:

1. Michael Duhon's convictions for theft and money laundering violate federal and state constitutional prohibitions against double jeopardy.

2. The trial court erroneously admitted unduly prejudicial character evidence.

3. There was insufficient evidence to establish that the crime of theft was committed.

4.      The trial court acted outside of its inherent authority when it taped Mr. Duhon's mouth shut during sentencing.

Defendant further asserts the following pro se assignments of error:

1.      Defendant was denied due process of law by the trial court.

2.      The trial court judge should have been disqualified due to impartiality.

3.      Defendant's convictions violate the prohibition against double jeopardy.

4.      Louisiana Revised Statute[s] 14:230 is unconstitutional.

5.      The State did not prove Defendant committed the offenses of money laundering or theft.

6.      The amended indictment bears the wrong name of the victim.

7.      Defendant and the jury were denied the benefit of professional valuation of the property taken.

8.      The State failed to disclose material evidence favorable to Defendant.

Defendant also asserts the following supplemental pro se assignments of error:

1.      The evidence presented at trial was insufficient to convict Defendant of money laundering.

2.      The trial court abused its discretion in denying his motion in arrest of judgment because the verdict was theft of "property" when the bill charged theft of "money."

3.      Defendant was unlawfully sentenced less than twenty-four hours after the denial of his motion in arrest of judgment and supplemental brief filed in support of the motion.

4.      The trial court erred in denying Defendant's motion for post-verdict judgment of acquittal due to Ms. Dutsch's "criminality" in cancelling licenses and violating the Unfair Trade Practices Act by competing with the partnership.

5.      The trial court erred in denying his request to compel the attendance of witnesses Daniel Landry and Chance James.

6.      The evidence presented to prove theft was insufficient to prove Defendant guilty beyond a reasonable doubt because his identity was not proven.

7.  Louisiana Revised Statutes 14:230(B)(2) is unconstitutional.

8.  Defendant's trial by a jury of twelve instead of six resulted in a violation of his constitutional rights.

9.  Information which would have exonerated Defendant was withheld by the prosecutor.

10. Judicial fraud and extrinsic fraud were committed by [the trial court judge] and the prosecutor in Defendant's case.

## DISCUSSION

## I.   Errors Patent

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find an error patent concerning Defendant's sentences that requires the sentences be vacated and the case remanded for resentencing.

Defendant was sentenced to serve fifteen years at hard labor, to run concurrently, for each of his convictions. The trial court suspended all but eleven years of "the sentence" and placed Defendant on three years of active supervised probation, subject to certain conditions without specifying which sentence, or whether both sentences, were suspended.[1]

In *State v. Ervin*, 17-18, pp. 2-4 (La.App. 3 Cir. 12/13/17), 258 So.3d 677, 680-81, this court addressed a similar issue in its review of the record for errors:

First, we find Defendant's sentences are indeterminate. When sentencing Defendant, the judge stated:

As it related to the five counts of carnal knowledge of a juvenile, at this time I will sentence you to five years with the Department of Public Safety and Corrections on each count. And that time will run consecutive for a total of twenty-five years with the Department of Public Safety and Corrections. And on the charge of attempted carnal knowledge of a juvenile, I will sentence you to two years

---

[1]  Although the sentencing minutes of court reflect that each of Defendant's sentences were suspended, in the event of a conflict, the transcript prevails. *State v. Wommack*, 00-137 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62.

3

on each count. That two years will run concurrent. Of that twenty-five years, I will suspend fifteen. And after you serve the first ten, when you are released, you will be released on five years of supervised probation.

A similar issue was before this court in *State v. Verret*, 08-1335 (La.App. 3 Cir. 5/6/09), 9 So.3d 1112. For each of four counts of negligent homicide, the defendant was sentenced to five years to run concurrently. The court then stated it was "ordering that [the defendant] serve four years of this sentence and that one year of the sentence be suspended." *Id*. at 1113. The defendant was placed on probation for four years. In addressing the patent sentencing error, this court stated:

> The trial court unequivocally imposed a five-year sentence on each count to run concurrently. When it ordered suspension of one year and discussed the terms and length of probation, however, the trial court only referred to one sentence. Insofar as the trial court failed to specify to what counts the suspension and probationary period applied, the trial court imposed indeterminate sentences.
>
> This court addressed a similar issue in *State v. Morris*, 05-725, p. 9 (La.App. 3 Cir. 12/30/05), 918 So.2d 1107, 1113, wherein it found that "[t]he trial court imposed indeterminate sentences because it suspended the sentences and placed Defendant on five years of supervised probation without specifying to which count or counts the probation applied." In *Morris*, 918 So.2d 1107, the court quoted from *State v. Taylor*, 01-680, p. 2 (La.App. 3 Cir. 11/14/01), 801 So.2d 549, 550:
>
> > After suspending five years of the defendant's eight-year sentence and the totality of the six-year sentence, the trial court imposed a five-year supervised probation period. It is unclear, however, to which sentence this probation period applies or whether it applies to each. Thus, the sentences are indeterminate and in violation of La.Code Crim.P. art. 879, which provides: "If a defendant who has been convicted of an offense is sentenced to imprisonment, the court shall impose a determinate sentence."
> >
> > Finding the defendant's sentences indeterminate, we vacate the sentences and remand this matter to the trial court for the imposition of determinate sentences. In doing so, we instruct the trial court to specify whether the periods of probation are to be

served concurrently or consecutively and upon what point the probated sentences begin as to each count. *See* La.Code Crim.P. art. 883.

Accordingly, we vacate the sentences on the grounds they are indeterminate and remand the case for resentencing. Upon remand, if any periods of probation or suspension are imposed, the trial court is instructed to specify to which count(s) they apply.

*Verret*, 9 So.3d at 1113-14.

Accordingly, we must vacate Defendant's sentences for felony carnal knowledge of a juvenile and attempted felony carnal knowledge of a juvenile and remand the case for resentencing with the trial court being instructed that if any periods of suspension or probation are imposed, it must specify to which count(s) they apply. Additionally, the sentences imposed for attempted carnal knowledge of a juvenile are indeterminate due to the trial court's failure to specify whether they are to be served with or without hard labor. *See* La.R.S. 14:27 and 14:80. Thus, when resentencing Defendant, the trial court should specify whether the sentences for attempted felony carnal knowledge of a juvenile are to be served with or without hard labor. *See State v. Chehardy*, 12-1337 (La.App. 3 Cir. 5/1/13), 157 So.3d 21.

Similarly, in this matter, Defendant's sentences must be vacated and the case remanded for resentencing. As in *Ervin*, the trial court is instructed that if any periods of probation are imposed, it must specify as to which count(s) they apply.

## II.    Assignment of Error No. 3

In his third assignment of error, Defendant contends there was insufficient evidence to establish that the crime of theft was committed. We address the foregoing assigned error before others because a finding of insufficient evidence would result in Defendant's acquittal. *State v. Hearold*, 603 So.2d 731 (La.1992). According to Defendant, the State presented insufficient evidence to establish that he had the necessary criminal intent to deprive the victim, Dutsch, of her money permanently, an essential element of theft as defined in La.R.S. 14:67.

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier

5

of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Additionally, when a conviction is based on circumstantial evidence, the evidence "must exclude every reasonable hypothesis of innocence." La.R.S. 15:438.

Louisiana Revised Statutes 14:67(A) provides:

> Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.

In this case, the record contains the trial testimony from the State's witness, Michael Anthony "Tony" Boagni, an investment advisor for Wells Fargo. Boagni testified that Dutsch was his client for eight years during his previous employment with Merrill Lynch, although he had helped her with her finances for over fourteen years. Boagni explained that as of January 2015, Dutsch's IRA retirement account at Merrill Lynch contained over $400,000.00 in investments. He indicated that money would be taxed upon withdrawal because it was considered pre-tax and the withdrawal of any money prior to age 59½ would result in a 10% penalty. Boagni noted that Dutsch was not eligible to withdraw the money without incurring a penalty. He testified that towards the end of January 2015, Dutsch told him that she wanted to move her account because Defendant, whom she referred to as her

6

accountant, was helping her invest the money in a piece of property which was to be sold within thirty days to a predetermined buyer at a higher price, i.e., an approximate 25% return. This concerned Boagni, who informed Dutsch that removing the money would have major tax implications. Boagni's concern prompted him to request a meeting with Defendant, which subsequently occurred via conference call between Boagni, Defendant, and Dutsch. Boagni testified as to the substance of Defendant's explanation during their conference call:

> A. The way it was described to me is . . . an LLC . . . was going to be opened for Ms. Dutsch's benefit, and a 401(K) was going to be opened that was going to be linked to the LLC.

> Then, the money from the IRA retirement account was going to be transferred into the 401(K). Then, there was going to be a loan that was going to be taken against the 401(K). Then, those funds that they got from the loan were going to be used to buy the house - - or used to buy the property.

> Then - - Within a 30-day period, after she sold it for a much higher price, then the money would come back, she would have her profit, they would pay the loan off. And he actually told me that, within 90 days, I'd have all the money back [at Merrill Lynch].

Boagni explained that after hearing Defendant's plan, he cautioned Dutsch multiple times not to proceed with the transaction because that kind of return in a thirty-day period was unheard of. Dutsch confirmed this in her trial testimony. Boagni also told Defendant that the transaction was likely fraudulent. Despite Boagni's warnings, Dutsch proceeded with a wire transfer of $404,591.00 from Merrill Lynch to Dutsch Beer and Distilling, LLC (hereinafter sometimes referred to as "Dutsch Beer") at Capital One Bank on February 4, 2015. On re-direct examination, Boagni testified that Defendant stated there would be no tax implications because the IRA money was being transferred into a 401(K) and if money was borrowed against the 401(K), there would be no tax implications with

that transaction either. According to Boagni, Defendant advised that his lawyer was setting up Dutsch Beer and the associated 401(K) account.

Dutsch, who testified at trial on the State's behalf, revealed that she was sixty-five years old and unmarried. During her almost forty-three-year employment with AT&T, she started as an operator and moved up to a managerial position. Dutsch, who has one deceased son, divorced her second husband in 2004 and met Defendant at a benefit dance in November 2014. At the time, she was living in Birmingham where she planned to return after "revamping" her house in Youngsville, Louisiana. The day following the dance, the two went to church, and Dutsch met Defendant's daughter, Adelina, who was nine or ten years old at the time. Before Christmas of that year, their relationship grew. It was during this time that Defendant told her he was "broke" and was contemplating suicide. Dutsch found this disturbing and loaned him money to buy his daughter's Christmas presents.

Dutsch acknowledged her original plan involving her Youngsville house changed after she met Defendant because he proclaimed that he would care for her, and they discussed businesses. According to Dutsch, Defendant claimed he was experienced with investments because he had worked for Edward Jones and had customers who were AT&T employees. Dutsch never followed up on these claims. Dutsch testified that within a couple of months, she fell in love with Defendant and they planned to go into business together and form Dutsch Brewery. She purchased a beer maker because Defendant wanted it and at Defendant's suggestion, they planned to purchase mobile homes and place them on Dutsch's property. Her property was zoned for commercial use, and they planned to sell the mobile homes at "a $10,000 less rate" to help the consumer. Another business venture they discussed involved commercial business loans. Dutsch testified that these business ventures, which the couple discussed from December 2014 through February 2015,

8

were devised by Defendant. Dutsch explained that Defendant had no financing for his ideas and was very inquisitive about her finances. She revealed the following at trial:

> A. . . . Just right off the bat, really, he wanted to know more about what I had, how much money I had, how I had it invested.
>
> And he would - - he started telling me that, when you get to a certain point in age, that they're going to automatically take money away from you, you'll be taxed.
>
> And I can't repeat everything he said, or even remember everything he said. But it led me to believe that I was going to lose, like, almost half of it, instantly, and that, if we used it toward a business venture, that it would be not taxable, and we could make more money, and then I could retire comfortably. So . . .
>
> Q. Okay. And you said, we could make more money. You used the term - -
>
> A. Well, I was going to be a partner, yes, sir. It was my money, and he was going to be the one, kind of - - He had the ideas, and he knew how to do the paperwork. And I didn't know any of that stuff. I mean, I don't balance my checkbook. So I just - - I never have been a - - very good at accounting.
>
> Q. Were you concerned about taxes on your retirement?
>
> A. No, sir. Because I believed what [Defendant] told me.
>
> . . . .
>
> Q. And what did Michael tell you about the taxes?
>
> A. He said there wouldn't be any repercussions on taxes, as long as I didn't touch the money, I didn't spend it. There would be no problem, as long as he put it in this - - He called it an IRA that went into the Dutsch Beer bank account that was at Capital One. And that there would be no penalties, as long as I didn't touch the money. So . . .
>
> Q. How did the idea of using your retirement to fund these business ventures come up?
>
> A. He presented it to me. He came up with the idea to move the money from Merrill Lynch to the bank account, which was an IRA account. And, then, we could - - He said you could use the money as long as you make money and put it back. And I may not be saying that exactly how he presented it to me. But that's what I got out of it.

9

Dutsch explained that she did not prepare any of the paperwork for the creation of the companies. She signed anything at Defendant's request because she trusted him. Dutsch recalled filling out and signing paperwork that had "IRA" written on it, leading her to believe Defendant put her retirement money into an IRA. She remembered opening a checking account with Defendant for Dutsch Beer in late January, right before her retirement money was transferred. Dutsch explained that the LLC paperwork she signed for Dutsch Beer and Affordable Manufactured Housing was filled out by Defendant.

Dutsch testified that Defendant instructed her sign blank checks, his logic being "if the money went to him and came out of his account, that it wouldn't be like from [Dutsch], as far as the IRA was associated." At trial, she identified a pre-signed check dated February 4, 2015, that Defendant wrote to himself for $89,501.55; Defendant signed the back of the check. Dutsch recalled Defendant telling her he put that money in his account. Dutsch next identified a pre-signed check dated February 5 and written in what appeared to be Defendant's handwriting. The check, which was for $189,000.00, was made out to Defendant's father, Calvin Duhon. The notation in the memo section stated, "[o]ffer to purchase of lots . . . Highway 720 and improvements." Dutsch explained this was the cost of the lots to develop Affordable Manufactured Housing, a business venture they were going into with Defendant's father. This venture was to make money and was "some of the investment that [she got] back for the retirement that [she] was looking forward to." She indicated they planned to purchase the lots from Defendant's family. However, to Dutsch's knowledge, neither Affordable Manufacturing, Dutsch Beer, nor Commercial Business Loans ever acquired property from Defendant's family. The two checks for $89,501.55 and $189,000.00 were written within a week of the $404,000.00 being deposited into the account on February 4. Dutsch revealed that

10

Defendant told her about the first check, but he did not tell her about the $189,000.00 check to his father. She became aware of this check when she closed the account near the end of 2015 or 2016. Dutsch identified two other checks that bore her signature. One was written on March 5 to Lafayette Consolidated Government; she was unsure whose handwriting was on this check. Another check dated October 9, 2015, was made out to Derek Construction in handwriting that looked like Defendant's. According to Dutsch, this was the company employed to do work on a home at 505 Avatar in Lafayette.

Dutsch identified a March 23, 2015 document labeled "Capital One statement savings/checking/MMA withdrawal," bearing her signature. The withdrawal was for $117,305.45, and Dutsch's driver's license number, which Defendant maintained a copy of, was included in the document. She testified Defendant told her he talked the bank into doing something they were not supposed to do outside of Dutsch's presence. She found out, after the fact, that these funds were taken. Dutsch was unaware where the money went or the intended purpose of the withdrawal. When asked if property was being developed at this point, Dutsch recalled attending a Consolidated Government meeting where zoning issues for the Blue Haven Estates entrance was discussed. Defendant and his father also spoke at the meeting. During this time, she basically lived with Defendant and by July of that year, she moved her things from Birmingham to her home in Lafayette. Dutsch was not concerned and believed everything was going the way it was supposed to. Defendant never advised her of any problems, difficulties, or concerns. If Dutsch asked about anything, Defendant told her not to worry.

Dutsch testified that Defendant wanted to help her lower her house note and instructed her to refinance her home. He talked her into signing part of the land surrounding her house over to Affordable HUD Housing, another company. This

11

was done on May 1, 2015. The consideration for the sale was listed as $89,000.00; however, Dutsch testified that she received no money. Her understanding was that she would get the property back in her name after Affordable Manufactured Housing used it; the property was not supposed to stay in Affordable HUD Housing. The intent was to place mobile homes on that property for customers to view "[s]o that Blue Haven Estates could even pick up." According to Dutsch, no work was ever done on the Larriviere Road property, i.e., next to Dutsch's house, to set up manufactured housing.

Dutsch testified that the property where Blue Haven Estates mobile home park was to be located needed construction work. Dutsch's ex-husband, Harold, owned a construction company and provided an estimate for the work which was "astronomical." Dutsch testified, "the promissory note part, from what I remember, it was supposed to go back. And, then, it wouldn't have been a problem." Defendant never signed a promissory note to her or Dutsch Beer. The statements for the Affordable Manufactured Housing account went to a post office box until Dutsch made changes and had them start coming to her. According to Dutsch, the statements for the Dutsch Beer account went to Defendant's father and stepmother's address.

Dutsch testified that Defendant approached her about purchasing a house located at 505 Avatar. Defendant's father had built the house, and his sister was selling it due to financial issues. Dutsch explained that she wanted Adelina to have a better place to live. When asked how Defendant was going to purchase the Avatar house, Dutsch revealed that her business or one of the businesses they owned together "was going to be used as a lender for Janalice [Defendant's sister], in some way. And that would give us dibs on bidding for the home[.]" Dutsch never lived in the Avatar home. Rather, Defendant, Adelina, and Tanya Ortego lived there.

12

Ortego was the second employee hired by the businesses after Cobie Turner, who was a salesperson for Affordable Manufactured Housing. According to Dutsch, Ortego was never a paid employee, but she answered the phone and passed out pamphlets.

Dutsch testified she and Defendant broke up in July 2015 after he called her a liar. She explained that she remained amicable because she had money invested in the businesses. Dutsch tried to get more involved in the "business plan" and wanted the land back in her name. According to her testimony, Defendant informed Dutsch that he could not sign the land back over to her and she did not need to know about the business because she would mess it up. Dutsch explained that Defendant blamed her for anything that went wrong. She noted that as time progressed, "light bulbs went off," but she kept trying because she thought "nobody would do this to anybody." Nothing with the businesses ever "really manifested." When asked if she discussed getting her money back or getting out of the business, Dutsch responded:

> No. I kept thinking, if we've gone this far, let's - - I was hoping that something would work from it, that it would - - The concept of Affordable Manufacturing Housing, to me, was a good concept. I honestly did think that.
>
> The Commercial Business Loan piece of it, I don't understand, to today. And Dutsch Beer was like a - - you know, that was a want.
>
> But, no, we really - - we really didn't. It's hard to explain, but I honestly was just so embarrassed, when it really started sinking in what I had done, that I went through a lot of stress, going to a therapist, trying to find out the why and all of that kind of stuff. So I was doing all of that, along with the August, September, October timeframe.

When it came time to file taxes, Dutsch asked Defendant for paperwork which he was unable to produce. She never received tax returns from the businesses to turn in with her tax return. When she filed her taxes, she owed $211,000.00 in federal taxes on money that "[she] didn't spend." Dutsch confirmed that if the money was

13

found to have been stolen, the taxes would not be owed. Dutsch testified that in the latter part of 2015, she was in a bad position financially and had to borrow money from people to pay her bills. She rented out her house and moved to a mobile home.

Dutsch testified that Defendant has not provided information or business statements regarding Affordable Manufactured, Commercial Business Loans, Affordable HUD, or Dutsch Beer. Defendant told her he met someone who would buy into the business and it would be a "$6 million deal," but it always fell through. When asked where Defendant was going to get the funds to loan through Commercial Business Loans, she said he had ties to a bank up north although she did not recall the name. Defendant gave her no paperwork from the bank nor the name of any contact person. On November 4, 2015, after being "hounded" by Defendant and to "shut him up," Dutsch signed a general power of attorney to him because she was going to be working in Birmingham for a month. Defendant explained it was necessary if anything came up with the business while she was gone. In March, she revoked this power of attorney.[2]

By the end of 2015 and beginning of 2016, Dutsch realized she had been "duped." Initially, she was ashamed but then sought legal help. When she went to the banks, the Dutsch Brewery account had nothing in it, the Affordable Manufactured Housing was overdrawn, and she had to pay a bounced check that had been drawn on the account. Defendant has never given her an explanation of what happened to her money nor has she received money from the companies. To her knowledge, Affordable Manufactured sold no manufactured homes and Dutsch Beer brewed no beer. According to Dutsch's testimony, Defendant told her that he loaned a man money from Commercial Business Loans although she was unsure of the

---

[2] Dutsch did not indicate the year she revoked the power of attorney.

14

amount of the loan or return. Dutsch revealed that no property is in her name from Affordable Manufactured Housing, Affordable HUD Housing, Commercial Business Loans, or Dutsch Beer. Dutsch acknowledged that she has received nothing from the Larriviere Road property. However, prior to trial, Calvin Duhon paid her $73,000.00. Dutsch recalled that in March 2015, she and Defendant talked to Calvin about purchasing the lot next door to him with the intent to build a home or put a mobile home on it to live there with Adelina. Dutsch wrote Calvin a check for $26,000.00 from her personal account after she sold some stock. Defendant took the check to his father, and Dutsch "never got anything from it." She revealed the check was cashed or deposited by Calvin.

On cross-examination, Dutsch identified defense exhibits which included: a September 23, 2015 email with an amendment and articles of organization relating to Affordable Manufactured Housing; a certificate from the Secretary of State's Office for Affordable Manufactured Housing filed July 21, 2015; articles of organization for Affordable Manufactured Housing, LLC; and the operating agreement for Affordable Manufactured Housing. Dutsch confirmed that Dutsch Beer and Affordable Manufactured Housing had bank accounts associated with them. She was the only person with signature authority for Dutsch Beer, and she had signature authority on the Affordable Manufactured Housing account. Dutsch testified that the foregoing exhibits told her nothing about the financial condition of Affordable Manufactured Housing. Dutsch acknowledged that, even though the statements for the accounts were not sent to her by mail, she could have obtained them from the bank.

Sabrina Courville, who dated Defendant for about six months beginning in the spring of 2012, also testified at trial on the State's behalf. During their relationship, Defendant expressed an interest in Courville financing an eighteen-

15

wheeler for him although he did not plan to invest his own money. Courville testified that she asked Defendant what would happen to the truck if he did not pay the note, and he responded that she could sell it.

Melody Childs, who dated Defendant from August 2009 to February 2010, also testified for the State at trial. Childs revealed that when their relationship became serious, they talked about buying a house together. According to Childs, Defendant told her his money was tied up in real estate and that he could be successful at E-Trading. Defendant informed Childs that if she loaned him money, he could earn a profit from his trading and that money could be used to purchase a house. Childs testified that she loaned Defendant $110,000.00 to be paid back within six months. He signed a promissory note which she recorded. As collateral and with no request by Childs, Defendant took out a life insurance policy on himself, named her as one of the beneficiaries, and gave her a signed check for the full amount of the loan in case something happened to him. She wired the money from her bank directly into his E-Trade account. After that point, Childs did not see Defendant as often which made her nervous about whether she would be paid back. She asked for repayment of $20,000.00 which Defendant paid in December or January. At that point, she told him that when the six-month period was up, she wanted the rest of the money. Childs began getting "pushback" from Defendant, and he acknowledged that he was not as successful in making profits in trading as he had anticipated. Defendant gave Childs a "pre-engagement" ring but never gave her an engagement ring as promised. When the promissory note became due, Childs took steps to get her money to no avail. Twice she attempted to cash the check Defendant had given her, and it bounced both times. She sent demand letters and ultimately filed a lawsuit in Lafayette Parish. Childs obtained a judgment, but, thereafter, Defendant filed for bankruptcy. However, the debt was not dischargeable because it was based on fraud.

16

A house on Renwood Circle owned by Defendant was seized and sold at a sheriff's sale. Although it did not satisfy the whole debt, Childs received a portion of the proceeds. During discovery in her lawsuit, Childs learned that checks had been paid to Toys R Us, electronics stores, and also disbursements made to a place in Russia.

Calvin Duhon, Defendant's father, also testified for the State. Calvin acknowledged that he knew Dutsch but never entered into a business relationship with her and Defendant. He explained that years ago, he had drawn a plan in anticipation of developing the land he owned off Highway 720 in Duson as a favor for Defendant. In time, if things "matured," Calvin was to get money from it. This was a verbal agreement, and if Defendant sold the property, he was to pay Calvin "so much a lot." Calvin revealed that there were fourteen lots, and Defendant gave him a $73,500.00 check for six lots. Calvin was shown a February 5, 2015 check from Dutsch Beer for $189,000.00 made out to him and which he deposited. Calvin testified that on February 12, 2015, at Defendant's request, he gave Defendant rather than Dutsch Beer a check for $115,500.00 after he made sure the $189,000.00 check cleared the bank. Calvin did not think anything of it when Defendant asked him to return the money. Calvin was unaware of what Defendant did with the money. Calvin kept the $73,500.00 difference because it was supposed to be for the six lots. Calvin testified that Defendant explained "when everything is done and closed . . . then, we'll be able to sell the other lots." After receiving the check, Calvin did not transfer any of the Highway 720 property and gave no one rights to work thereon.

Calvin revealed that Defendant, not Dutsch, talked to him about buying a lot next to his house at 111 Haven Estate. He identified a $26,000.00 check with the name "Marie Dutsch" on the bottom and made out to him. On March 10, 2015, the check was deposited into Calvin's Midsouth Bank account which was for the lot. Thereafter, at Defendant's request, Calvin wrote a $14,000.00 check to Defendant

17

which contained the word "reimbursement," and Calvin kept $12,000.00 for the lot. Calvin never signed any paperwork to transfer the lot next door to his house, and he still had the $12,000.00 in the bank. He testified that he never told anyone he would sell them that lot. When asked why he took the $26,000.00, he replied, "[b]ecause [Defendant] wanted to do that." Calvin explained: "Michael wanted to . . . buy the lot[.] . . . But, like I told him, . . . I sold the lot next door to my grandson for . . . almost $27,000. I said, no way I'm going to, . . . give it away. . . . But I let him do, . . . what he wanted[.]"

Calvin acknowledged that he never intended to sell the lot next door to his house at 111 Haven Estate, and he never invested in Affordable Manufactured Housing. At trial, Calvin identified a $50,000.00 check signed by him and made out to Affordable Manufactured Housing, LLC, on September 23, 2015. Calvin revealed that he wrote the check at Defendant's request. Calvin identified a deposit slip dated September 23, 2015, for a $50,000.00 check deposited into his and his wife's MidSouth Bank account. The deposited check was made out to Calvin and signed by Defendant. Calvin was unaware why he received a $50,000.00 check from Defendant and wrote one to Affordable Manufactured Housing in the same amount on the same day.

At trial, messages left by Defendant on Calvin's voice mail were played to the jury.[3] Calvin identified his son's voice on messages left on Calvin's home phone.[4] We have reviewed the transcript of the messages contained in the supplemental record. In the first voice mail, Defendant essentially instructed Calvin on what to say, presumably for an upcoming hearing. Defendant advised Calvin that if he did

---

[3] While arguing over an objection, the prosecutor stated that the messages were left in September 2018, but this was not confirmed by Calvin during his testimony.

[4] Calvin testified that he never heard the messages left at his house, but he identified the voice as Defendant's.

18

not say he and Dutsch were general partners for the subdivision, "they" (presumably the State) were going to file criminal charges against Calvin. In the second message, Defendant stated that "a partnership agreement . . . will protect you[,]" reiterating that criminal charges could not be filed against a general partner. He explained Calvin's involvement in the partnership and how things evolved, minimizing Defendant's own level of involvement. Defendant told his father that following his instructions would keep Calvin out of the trap "they" were setting for him.

Calvin testified that he did not develop the lots because the income from selling them at $12,500.00 each less the cost of improvements, i.e., approximately $262,000.00, would result in a loss of approximately $88,000.00 and loss of his land. Prior to trial, Calvin paid $73,500.00 to Dutsch. He again confirmed that he did not transfer any of the fourteen lots to anyone. On cross-examination, Calvin was asked if the check for $189,000.00 was for land he owned on Highway 720, and he responded, "Whatever. Yeah." He confirmed the land was to be used for manufactured homes, Blue Haven Estates.

Jeff Faulk of the Louisiana Department of Justice, Bureau of Investigation, also testified at trial on the State's behalf. Faulk's job requires him to conduct financial investigations regarding white-collar crime, investment fraud, and securities fraud. In December 2016, Faulk met with Dutsch after she suspected she had been a victim of fraud. Faulk's office subpoenaed records for Commercial Business Loans, Affordable Manufactured Housing, and Dutsch Beer. The records revealed that Dutsch Beer maintained an account with Capital One Bank NA, account number 5612, which Dutsch opened on February 3, 2015. She was the sole authorized signatory on the account, the statement address was 111 Haven Estate Lane, and the opening deposit was $500.00. On February 4, 2015, there was a wire transfer deposit of $404,591.00 from Merrill Lynch IRA services, bringing the

balance to $405,091.00. On the same day, there was a starter check written to Defendant in the amount of $89,501.55 signed by Dutsch. On the memo line was written "promissory note, 3.15 interest[.]" The check was deposited into Capital One Bank account ending in 7818, which was Defendant's account. On February 5, 2015, another starter check signed by Dutsch was written in the amount of $189,000.00 from Dutsch Beer account 5612 to Defendant. According to Faulk, "[o]ffer to purchase of lots, six, in parentheses, Highway 720, Riceland Road is struck out, and improvements" was written on the memo line. This check was processed on February 9, 2015, and deposited into MidSouth Bank account ending in 2164, which belonged to Audrey and Calvin Duhon. The February statement reflected an ending balance of $126,598.45. The third check, processed on March 11, 2015, was issued to Lafayette Consolidated Government in the amount of $384.00. On the memo line was written, "[h]alf payment to LCG Metro." According to Faulk, the next transaction on March 23, 2015, was a customer counter withdrawal for $117,305.45. It was signed by Dutsch and deposited into account 5426, an account for Affordable HUD Housing, LLC, on which Defendant had signature authority. The ending balance for March in the Dutsch Beer account ending in 5612 was $8,900.00. The April statement reflected no checks or deposits. On September 29, there was a credit for $688.48 from account 5426, i.e., Affordable HUD account, and the following day there was a withdrawal for the same amount that went to Standard Mortgage on behalf of Cobie Turner. The October statement reflected a check 10408 for $6,000.00 written to "cash." The memo line states, "Derek Construction payment" and it was deposited into account 5426. Finally, there was a $2,600.00 transfer debit to the account ending in 7818, Defendant's account. This left a balance of $160.00. Other than service charges, ACH withdrawals, and overdraft charges, there were no further transactions on the account.

20

Faulk also requested all information relating to the withdrawal of $117,305.45 on March 23, 2015, from the Dutsch Beer account although Capital One had no written statements, audio recordings, or video recordings of this transaction. Faulk subpoenaed records from MidSouth Bank. According to Faulk's testimony and bank records, Audrey and Calvin Duhon had a joint account ending in 2164 opened on June 23, 2003, with two signatures on file and an initial deposit of $2,000.00. Prior to the $189,000.00 deposit from Dutsch Beer, the balance was $235.64. After the $189,000.00 deposit, check number 2474 for $115,500.00 was processed on February 13 and deposited into Defendant's Capital One account 7818. The check was signed by Audrey Duhon with the memo line indicating, "escrow loan." On March 9, 2015, check 2476 was written for $14,000.00 with the memo section stating "reimbursement" and deposited in Defendant's Capital One account 7818. In March, check number 2478 was written to cash for $8,000.00. On March 9, 2015, a $26,000.00 check from Dutsch's personal account, i.e., Capital One account 8600, was deposited into Audrey and Calvin's joint checking account with the notation "one lot, not refundable." In September, there was a deposit of $50,000.00 and an unnumbered check for $50,000.00 written on September 23, 2015, to Affordable Manufactured Housing, LLC, and deposited into its account at MidSouth Bank, i.e., account 3088. On September 25, 2015, there was a starter check for $50,000.00 signed by Defendant with the notation "Affordable."

According to Faulk, Defendant's personal account at Capital One, i.e., account 7818, was opened with a $25.00 deposit on August 16, 2005. Defendant had signature authority and statements were mailed to 111 Haven Estate. In November 2014, there were $2,846.00 in deposits and $2,976.00 in withdrawals, with an ending balance of $199.23. The ending balance in December was $656.86 and in January it was $673.57. The next statement showed an ending balance of

$204,444.05 from the $89,501.00 and $115,500.00 deposits. In March, there were eight deposits totaling $16,691.96 and fifty-three checks and withdrawals totaling $24,641.56. One of the deposits was on March 9, 2015, for $14,000.00, and it was from Calvin from MidSouth Bank account 2164. On Defendant's account, there was a debit card purchase at Yancey Events in Utah.[5] In April, $1,700.00 was deposited to the account and $8,000.00 was spent. In general, the withdrawal amounts were in the hundreds with many of them being even dollar transactions and ATM cash withdrawals. According to Faulk, Defendant's expenditures from the account increased dramatically at that point in time. The April statement showed deposits of $1,516.00 from a counter deposit of $272.00 and two checks for $622.00 from the Treasury Department. He received two $622.00 checks each month, and, according to Faulk, these were the primary deposits into the account prior to the new activity in 2015. That month, i.e., April, there were sixty-four checks and debits totaling $178,288.48 with the largest one being a customer withdrawal of $167,000.00 on April 30, 2015. Faulk determined it was a statement withdrawal signed by Defendant from account 7818 deposited into Affordable HUD account 5426. This left an ending balance of $12,807.94 in his account.

Faulk testified that the following month there were deposits of $89,000.00 from Dutsch and checks for $115,500.00 and $14,000.00 from Calvin. There were withdrawals of a $5,000.00 cashier's check to D.R. Horton with the notation "201 Crooked Stick Lane. Refundable deposit." The back of the check indicated that it was "not used for purposes intended, for deposit only," and it was deposited back into the account on September 16. Another check for $167,000.00 went to Affordable HUD. There were also debit card purchases and withdrawals with one

[5] Utah was the state of incorporation of Affordable HUD Housing.

22

being $4,000.00 to Auction Brokers. Faulk testified that at the end of September 2015, the activity on the account went back to what it was in 2014. Faulk did not see any payments to Dutsch Beer or Dutsch's account from any of Defendant's personal accounts. During the course of his investigation, Faulk became aware of a judgment Childs had against Defendant that was non-dischargeable against him. Thus, if any funds stayed in Defendant's account long enough for Childs to be aware of them, the funds could be seized.

Faulk was asked about Affordable Manufactured Housing's account, i.e., account 3088, opened September 23, 2015 at MidSouth Bank with Defendant and Dutsch being the authorized signers. The statements for this account went to 505 Avatar Street. According to Faulk's testimony and other evidence in the record, the first deposits were for $50,000.00 on September 23, 2015, and $160.00 on September 25, 2015, and a starter check for $50,000.00 to Calvin was processed on September 25, 2015. Faulk revealed that Affordable Manufactured Housing was in the business of buying and selling manufactured housing. He learned during the course of his investigation that there are several requirements for acquiring a license for this type of business. The applicant has to have $50,000.00 net worth, which this transaction would show. The October statement showed an October 2, 2015 cash deposit for $2,605.05 and, four days later, a check numbered 2002 in that amount made payable to Dwight Andrus Insurance with a notation of "general liability insurance." The back of the check stated, "for deposit only, J.P. Morgan Chase." On December 23, 2015, there was a $200 deposit and a $250.00 unnumbered check to Louisiana Manufactured Housing processed on December 31, 2015. This check was signed by Defendant and had the notation, "annual fees, licensing." The next activity in the account was a May 26, 2016 deposit of $280.00, along with some miscellaneous debit transactions. A portion of the premium paid to Dwight Andrus

Insurance, $1,181.66, was refunded and deposited to Affordable Manufactured Housing's account on October 27, 2016. The next day, a check in this same amount was written to cash and signed by Defendant with the notation, "reimbursement for Avatar taxes." That check was deposited to Defendant's personal account at Capital One, i.e., account 7818, on October 27, 2016. On December 31, 2016, this account had a negative $20.98 balance.

Faulk discussed the account for Commercial Business Loans, i.e, account 3703, which was opened at MidSouth Bank on November 4, 2015. He advised that the authorized signers were Defendant and Dutsch, and the statement address was listed as 505 Avatar Drive. The first statement dated November 30, 2015, showed a $100.00 deposit. The largest transactions Faulk found in the account was a $1,000.00 deposit and a $500.00 check processed February 26, 2016, written to Defendant with the notation, "transfer to Capital One account." Faulk testified that he saw nothing in this account indicating money moving out to an entity other than the check to Defendant. Most of the transactions were ATM deposits and withdrawals of less than $1,000.00.

Faulk explained that information obtained from the assessor's office indicated property at 505 Avatar was listed under Commercial Business Loans and the company had a quit claim deed on the property. Documentation revealed that in consideration for the sum of $146,000.00, the property was transferred to Commercial Business Loans, LLC, on June 30, 2015. Further, the trustee was authorized to pay Caldwell Banker Pelican Real Estate a commission of 3% and 3% to Defendant, purchaser's realtor. Faulk did not see $146,000.00 in any of the bank records for Commercial Business Loans. The last activity shown for Commercial Business Loans was December 16, 2016.

24

After reviewing the evidence presented at trial, we find the State proved that Defendant intended to deprive Dutsch of her money permanently. After Defendant established a romantic relationship with Dutsch, he convinced her to transfer her retirement money from an IRA account to what he claimed was an IRA account associated with Dutsch Beer so there would be no tax consequences. However, the money was deposited into a checking account rather than an IRA. Defendant convinced Dutsch that if the money was not in her name, she would not be taxed. Once deposited, Defendant controlled the money and failed to provide information or documentation to Dutsch when requested, even for the filing of income taxes. When she inquired, Defendant told her he would take care of the businesses. On more than one occasion, Defendant wrote checks to his father and directed his father to pay him a portion of the money back. No lots were ever transferred to Defendant, Dutsch, or any of the businesses, and no purchase agreements were signed. Accordingly, this assignment of error is without merit.

## III.    Assignment of Error No. 1

In his first assignment of error, Defendant contends that his convictions for theft and money laundering violate federal and state constitutional prohibitions against double jeopardy. He raised this issue in a motion to quash which the trial court determined was premature. According to Defendant, theft does not require an additional fact above and beyond that necessary for a conviction of money laundering. Because the conviction for money laundering did not require proof of any additional facts above and beyond those required for a conviction of theft, Defendant asserts his conviction and sentence for money laundering should be vacated.

Theft is defined in La.R.S. 14:67(A) as:

25

Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.

Defendant was charged with money laundering, La.R.S. 14:230(B)(5), which makes it "unlawful for any person knowingly to . . . . [a]cquire or maintain an interest in, receive, conceal, possess, transfer, or transport the proceeds of criminal activity.

Recently, this court discussed changes to Louisiana's double jeopardy law:

The Louisiana Supreme Court has very recently announced that Louisiana courts "are bound only to apply the standard established by the U.S. Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) to protect against double jeopardy[.]" *State v. Frank*, 16-1160 (La. 10/18/17), 234 So.3d 27. Under the *Blockburger* test, "there is no double jeopardy . . . where each provision requires proof of an additional distinct element that the other does not." *State v. Cooley*, 11-959, p. 12 (La.App. 3 Cir. 4/4/12), 87 So.3d 285, 295, *writ denied*, 12-1008 (La. 10/26/12), 99 So.3d 640. In other words, "a defendant can be convicted of two offenses arising out of the same criminal incident if each crime contains an element not found in the other." *Frank*, 234 So.3d at 30, (*citing State v. Balentine*, 47,858, p. 2 (La.App. 2 Cir. 7/10/13), 119 So.3d 979, 985 (Drew, J., dissenting)).

Applying the *Blockburger* test to the facts of this case, both offenses for which Defendant was convicted require proof of an element not included in the other. Defendant, here, was convicted of aggravated second degree battery, which includes the intent to inflict serious bodily injury, and second degree kidnapping, which includes the imprisoning or forcible secreting of a person. La.R.S. 14:34.7 and 14:44.1. Clearly, each of these crimes contains an element not included in the other, and the element unique to each crime requires proof of facts which the other crime does not.

*State v. Hampton*, 17-383, p. 12 (La.App. 3 Cir. 11/15/17), 259 So.3d 1125, 1132.

We find that Defendant's convictions for theft and money laundering do not constitute a violation of the prohibition against double jeopardy because both offenses require proof of an element not included in the other. Theft requires the intent to permanently deprive the other of the subject of the taking, an element not included in money laundering. The elements of money laundering prohibiting

26

concealing, transferring, or transporting the proceeds of criminal activity are not required by the theft statute. Accordingly, there is no merit to Defendant's claim.

## IV. Assignment of Error No. 2

In his second assignment of error, Defendant contends the trial court erred by admitting unduly prejudicial character evidence in the testimony of Childs, Courville, and the bankruptcy court judgment against Defendant. He argues this evidence was not independently relevant to show opportunity, knowledge, or absence of mistake. Defendant opines that the relevance in admitting this evidence was not outweighed by its prejudicial effect. He notes that the only contested issue at trial was his intent, and he did not contest the evidence concerning his efforts to build and run the businesses, meaning the categories of opportunity, knowledge, or absence of mistake are not relevant. Because intent was the critical issue in this case, Defendant contends the error cannot be harmless.

The State contends the testimony of Courville and Childs, as well as the bankruptcy judgment of fraud, created a clear picture of Defendant's intent and revealed a plan. The State notes the bankruptcy judgment was relevant to show the funds were moved around frequently so as to avoid easy connection to Defendant.

Louisiana Code of Evidence Article 404 provides in pertinent part:

> **B. Other crimes, wrongs, or acts.** (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

In *State v. Henry*, 19-65, pp. 36-39 (La.App. 3 Cir. 12/18/19), 287 So.3d 847, 870-72, this court stated:

The supreme court has held that a "district court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion." *State v. Taylor*, 16-1124, 16-1183, p. 18 (La. 12/1/16), 217 So.3d 283, 296.

. . . .

In *Taylor*, 217 So.3d at 291 (emphasis in original), the supreme court stated the following regarding the State's burden of proving the commission of the other crimes evidence:

> [W]e now recognize and hold that when seeking to introduce evidence pursuant to La. C.E. art. 404(B), the state need only make a showing of *sufficient* evidence to support a finding that the defendant committed the other crime, wrong, or act.

Additionally, the supreme court stated:

> Code of Evidence article 404(B)(1) embodies the settled principle that evidence of other crimes may be admissible if the state establishes an independent and relevant reason for its admission. . . . Moreover, even when the other crimes evidence is offered for a purpose allowed under Article 404(B)(1), the evidence must have substantial relevance independent from showing defendant's general criminal character and thus is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. . . . It is the duty of the district court in its gatekeeping function to determine the independent relevancy of this evidence. The district court must also balance the probative value of the other crimes, wrongs or acts evidence against its prejudicial effects before the evidence can be admitted.

*Id.* at 292 (citations omitted).

. . . .

In *State v. Garcia*, 09-1578, p. 55 (La. 11/16/12), 108 So.3d 1, 39, *cert. denied*, 570 U.S. 926, 133 S.Ct. 2863, 186 L.Ed.2d 926 (2013), the supreme court stated the following with respect to the applicability of harmless error to the erroneous admission of other crimes evidence:

> Finally, the erroneous admission of other crimes evidence has long been held subject to harmless error review. La.Code Crim. Proc. art. 921; *State v. Johnson,* 94-1379, pp. 14-15 (La. 11/27/95), 664 So.2d 94, 100-01 (errors leading to improper admission of evidence subject to harmless-error analysis; error harmless if verdict "surely unattributable" to error)(quoting *Sullivan v.*

In the instant matter, the trial court ruled as follows on the admissibility of the witnesses' testimony:

> I find that the evidence regarding what transpired between Ms. Childs and Mr. Duhon, as well as what transpired between Ms. Courville and Mr. Duhon, is very akin to what happened to Ms. Dutsch.
>
> The purpose of 404(B) is to establish certain factors that would be necessary to establish in order to prove, in this case, that . . . there was a theft.
>
> . . . Code of Evidence Article 404(B) talks about those situations in which . . . this type of evidence is admissible. Again, it's admissible for limited purposes.
>
> But, specifically, in this case, the State has the burden of proving that there was a theft committed in this case. And, as part thereof, will be required to prove things, such as opportunity, intent, knowledge, identity, and absence of mistake. And all of those things are relevant. And all those issues are bases for the allowance of evidence of other wrong acts.
>
> So I'm going to allow that. The jury is going to be charged on the limited basis for which those acts are being introduced.

As discussed above, the trial court has broad discretion, and its ruling will not be disturbed absent an abuse of discretion. We find both Childs' and Courville's testimony was independently relevant and probative to show Defendant's plan in committing the theft, and the bankruptcy judgment was relevant to show his motive in committing money laundering. Accordingly, the trial court did not err in determining the probative value outweighed the prejudicial effect of this evidence and did not abuse its discretion in admitting this evidence.

Even if the trial court erred in admitting this evidence, the verdict was unattributable to the error. The testimony of Dutsch and Faulk established that Defendant committed theft by taking Dutsch's money by means of fraudulent conduct or representations with the intent to permanently deprive her of same. Their

29

testimony also established that Defendant committed money laundering by concealing, possessing, and transferring the proceeds of the criminal activity. Accordingly, this assignment of error is without merit.

## V. Assignment of Error No. 4

In his fourth assignment of error, Defendant contends the trial court acted outside of its inherent authority when it taped his mouth shut during sentencing. He requests that this court vacate his sentences and remand for resentencing. Within this assignment of error, Defendant includes a paragraph alleging the evidence does not support the extensive prison term of fifteen years and that a probationary term with the imposition of restitution would be more just. In light of our finding above that Defendant's sentences be vacated and the case remanded for resentencing due to an illegality, this claim is moot.

## VI. Original Pro Se Brief

Defendant's lengthy pro se brief does not identify his claims as assignments of error. Accordingly, we have broken down the claims and identified them as individual assigned errors.

### A. Pro Se Assignment of Error No. 1

Defendant claims he was not provided due process of law by the trial court. He requests this court read his motion in arrest of judgment and its supplement. Defendant claims the jury verdict was not a unanimous six as required by La.R.S. 14:67 and La.Code Crim.P. art. 782.

In Louisiana, imprisonment imposed for theft over $25,000.00 may be with or without hard labor. La.R.S. 14:67(B)(1). Imprisonment for money laundering in the amount of $20,000.00 or more but less than $100,000.00 is to be at hard labor. La.R.S. 14:230(E)(3). Louisiana Code of Criminal Procedure Article 493.2 states in pertinent part:

Notwithstanding the provisions of Article 493, offenses in which punishment is necessarily confinement at hard labor may be charged in the same indictment or information with offenses in which the punishment may be confinement at hard labor, provided that the joined offenses are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan. Cases so joined shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.

In this case, Defendant was correctly tried by a jury of twelve who unanimously concurred in rendering a verdict of guilty of theft and money laundering. Accordingly, Defendant's claim is without merit.

**B.     Pro Se Assignment of Error No. 2**

Defendant contends the trial court should have disqualified itself due to impartiality as shown by the denial of every motion he filed. He claims that any "unprejudiced" trial court would have recused itself in a situation such as this, where material witnesses, Defendant, some of his business associates, and Dutsch were at this judge's re-election campaign where food was being provided by her and monetary contributions were being accepted by her. Defendant claims there was an assistant district attorney present as well, and after Defendant's "false arrest," the trial court would not allow him to be subpoenaed as a material witness for Defendant about his pursuit of a civil collection and his use of court resources to pursue Defendant's assets. Defendant maintains that the trial court refused to allow him to subpoena witnesses, refused to allow him to obtain his "original evidentiary documents seized from him by the arresting officer," and threatened before trial to have him removed if he opened his mouth or independently objected, i.e., without counsel, to anything. He claims the trial court threw away over ten of his pro se motions. Finally, Defendant alleges that the trial court refused to put his witness, Chance James, "under bond." In summary, Defendant appears to claim that the trial court's prejudice resulted in him being denied due process of law and a fair trial.

31

We find the current record on review sheds no light on Defendant's allegations or they are too general for a proper analysis. Accordingly, they are deferred to the post-conviction relief process.

## C.     Pro Se Assignment of Error No. 3

Defendant claims his prosecution for theft and money laundering violated the prohibition against double jeopardy. This claim was addressed in Assignment of Error No. 1 and need not be readdressed.

## D.     Pro Se Assignment of Error No. 4

Defendant contends La.R.S. 14:230 is unconstitutional and not a valid statute.

In *State v. Overstreet*, 12-1854, p. 12 (La. 3/19/13), 111 So.3d 308, 316, the supreme court stated:

> This Court has expressed the challenger's burden as a three-step process. First, a party must raise the unconstitutionality in the trial court; second, the unconstitutionality of a statute must be specially pleaded; and third, the grounds outlining the basis of unconstitutionality must be particularized. Further, a district court may not *sua sponte* rule that a statute is unconstitutional, nor can it declare a statute unconstitutional on grounds other than those asserted by a movant.

Defendant notes that he raised this issue in the trial court in his Motion in Arrest of Judgment. In that motion, Defendant argued the statute did not remain consistent with the purpose behind the money laundering statute federal purpose nor did it adopt a narrow focus with the larger focus behind the legislation. He stated that his challenge was to the statute "as it applies incorrectly to the instant case to the defendant's indictment to the intent of washing of cash or coins implied by both Louisiana and federal statutes." Defendant opined that if this statute was ruled valid in the instant case, Dutsch would also have to be indicted because she was the manager and trustee of the illegal funds. The trial court denied the motion stating, "[a] motion for post verdict judgment of acquittal was already denied on 2/21/19."

32

On appeal, Defendant claims La.R.S. 14:230 violates federal law which holds that transactions charged as money laundering cannot be the same transactions through which the funds become tainted by the crime, citing *United States v. Napoli*, 54 F.3d 63 (2d Cir. 1995), *abrogated on other grounds as stated in United States v. Genao*, 343 F.3d 578 (2d Cir. 2003). We find that the holding of *Napoli* does not support Defendant's argument. The issue addressed in *Napoli* was whether the district court's upward departure from the sentencing guidelines for fraud through use of the money laundering guideline was proper. The appellate court concluded that it was not because the "district court's factual findings [were] not sufficient to establish the offense of money laundering or to take this case from the heartland of the fraud guideline." *Id*. at 63.

Defendant contends that the offense of money laundering is unconstitutional as written because it must be distinct from the underlying offense that generated the money to be laundered. He claims federal lawmakers knew that if it was not distinct, it would create a double jeopardy issue, something Defendant feels Louisiana lawmakers failed to recognize.

On review, it appears Defendant, in tying this claim to double jeopardy, is indicating that the money laundering statute's inclusion of the proceeds of criminal activity would somehow result in a conviction of the offense from which the criminal funds were obtained. That is not the case. Violation of the money laundering statute is not necessarily tied to the commission of any other offense. Although not directly on point in that the constitutionality of the money laundering statute was not at issue, the supreme court briefly discussed money laundering being distinct from the underlying offense which generated the money in *State v. Lemoine*, 15-1120, pp. 5-6 (La. 5/3/17), 222 So.3d 688, 693-94 (footnotes omitted):

We are also unpersuaded by the First Circuit majority's view that the Louisiana money laundering statute is susceptible to the "merger problem;" a concept according to which a statute is drafted in such a way that the evidence necessary to prove the underlying or primary crime (here, theft from Union Pacific) is sufficient to also prove a more serious secondary offense (here, money laundering). Evidence of defendant's fraudulent billing alone, *i.e.*, the thefts for which he was not prosecuted, could not, without more, serve as a basis for a money laundering prosecution. Rather, Section (B)(2) of the money laundering statute applies here because the evidence shows, not only that defendant repeatedly stole from Union Pacific, but that he was depositing those ill-gotten gains into his business account, in which he maintained an interest and from which he routinely transferred money to perpetuate and further his business operations, which functions involved the recurring thefts. Put another way, this is not a "garden variety" theft case, as defendant asks us to find, but rather, in light of the use of stolen money to finance future thefts, a prototypical money laundering case.

Moreover, related concerns that Section (B)(2) is open-ended, because it applies to "anything of value," overlook the purpose of the money laundering statute, which is not to enable prosecutors to latch onto most any crime and, on a whim, elevate the charges to the offense of money laundering, but rather as the statute's title announces, to prohibit "transactions involving proceeds of criminal activity." *See* R.S. 14:230. For this reason, defendant was subject to prosecution for and ultimately found guilty of the more serious offense of money laundering. *See Lemoine*, 14-1158, pp. 7-8, 174 So.3d at 52-53 (Welch, J., dissenting) ("It sets a dangerous precedent to judicially legislate in accordance with federal law and federal jurisprudence without attempting to ascertain the *Louisiana legislative intent*. . . . The clear legislative intent was to prohibit transactions involving the proceeds of criminal activity.").

Accordingly, Defendant's claim has no merit and is denied.

### E.     Pro Se Assignment of Error No. 5

Defendant claims the State did not prove he committed money laundering or theft because he acted at Dutsch's direction. The jury in this case resolved the credibility determination against Defendant, and this court should not second guess the credibility determination made by the jury. Accordingly, this claim is meritless.

### F.     Pro Se Assignment of Error No. 6

Defendant contends the amended indictment has the wrong name of the victim which he claims is a material, reversible error. The original bill of information listed

the victim's name as "Marie Dutsch." The record contains an amended bill of information that is identical to the original bill with the exception of a change to the subsection of the money laundering statute under which Defendant was charged. However, Defendant appears to claim that the victim should have been listed as Dutsch Beer and Distilling, LLC instead of Marie Dutsch. Again, we note that the State determines how cases will be prosecuted; additionally, the money was originally taken from Dutsch before it was placed in Dutsch Beer and Distilling, LLC's account. Accordingly, Defendant's claim has no merit.

### G. Pro Se Assignment of Error No. 7

Defendant appears to claim that both he and the jury were denied the benefit of professional valuation of the property taken in this case. He also contends that he never received money from Dutsch. We note that the amount of money taken from Dutsch's retirement account was established through the testimony of Dutsch, Boagni, and Faulk. Professional valuation of the money taken was unnecessary, and Defendant has failed to show how it would have done anything to benefit the defense. This assignment of error has no merit.

### H. Pro Se Assignment of Error No. 8

Defendant appears to claim the State failed to disclose material evidence favorable to him in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963); however, he fails to allege what specific evidence was withheld. Accordingly, this claim is denied.

## VII. Supplemental Pro Se Brief

Defendant filed a supplemental pro se brief. Most of his claims are not identified as assignments of error, and some assignments of error contain several claims. We have broken down Defendant's claims as individual assignments of error for purposes of clarity.

## A.     Supplemental Pro Se Assignment of Error No. 1

Although not listed as an assigned error, Defendant contends the evidence presented at trial was insufficient to convict him of money laundering. In doing so, he alleges the State did not prove motive, specific intent, the element of furthering criminal activity, nor did it show any element of any misdemeanor crime. Defendant claims the State failed to show any civil specific performance failures or theft.

The subsection of money laundering with which Defendant was charged, La.R.S. 14:230(B)(5), makes it unlawful for any person to knowingly "[a]cquire or maintain an interest in, receive, conceal, possess, transfer, or transport the proceeds of criminal activity." In *State v. Carmouche*, 12-1052, p. 16 (La.App. 3 Cir. 4/3/13), 117 So.3d 136, 146, this court stated, "[a]lthough motive is not an essential element of second degree murder, 'a lack of motive may properly be considered as a circumstance mitigating against specific intent.'" Further, money laundering is a general intent offense. *Lemoine*, 222 So.3d 688. Louisiana Revised Statutes 14:10 defines general criminal intent as being "present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act."

We find that the State was not required to prove either motive or specific intent. Additionally, "furthering criminal activity" did not have to be proven as it is not an element of the statute under which Defendant was charged. Finally, neither a misdemeanor offense, civil specific performance, nor theft were required to be proven to satisfy the elements of La.R.S. 14:230 listed above. Accordingly, Defendant's claims lack merit.

## B. Supplemental Pro Se Assignment of Error No. 2

Defendant contends the trial court abused its discretion in denying his motion in arrest of judgment because the verdict was theft of "property" when the bill charged theft of "money." Defendant refers to the jury instructions wherein the trial court referred to "property" instead of "money." He maintains the jury returned an unresponsive verdict, and his motion in arrest of judgment should have been granted.

Defendant was charged with theft of money valued over $25,000.00. The short form indictment contained in La.Code Crim.P. art. 465(A)(44) allows for theft to be charged as "A.B. committed theft of _____ (state property stolen) of a value of _____ dollars." The list of responsive verdicts given to the jury referred to the charge as "theft of property having a value of twenty-five thousand dollars or more," as required by La.Code Crim.P. art. 814, and that was the verdict returned by the jury. Property is defined in La.R.S. 14:2(A)(8) as "both public and private property, movable and immovable, and corporeal and incorporeal property." "[M]oney is a corporeal moveable[.]" *State v. Greene*, 09-2723, p. 8 (La. 1/19/11), 55 So.3d 775, 779. Thus, money falls within the definition of property.

Defendant additionally contends that proceeds cannot be both "lawful money" and "unlawful money." Although Defendant's claim is somewhat difficult to interpret, we note that "lawful money" can be the subject of a theft. Once stolen, it becomes proceeds of criminal activity, or "unlawful money" as referred to by Defendant. Accordingly, Defendant's claim has no merit.

## C. Supplemental Pro Se Assignment of Error No. 3

Defendant contends he was unlawfully sentenced less than twenty-four hours after the denial of his motion in arrest of judgment and supplemental brief filed in support of the motion. This claim is rendered moot by our finding that Defendant's sentences be vacated, and the case remanded for resentencing.

**D.    Supplemental Pro Se Assignment of Error No. 4**

Defendant contends the trial court erred in denying his motion for post-verdict judgment of acquittal because of Dutsch's "criminality" in cancelling some licenses and violating the Unfair Trade Practices Act by competing with the partnership. We find these are civil claims which are not properly raised in a criminal proceeding. Additionally, the district attorney has control over whom is prosecuted. La.Code Crim.P. art. 61. Accordingly, these claims have no merit.

**E.    Supplemental Pro Se Assignment of Error No. 5**

Defendant contends the trial court erred in denying his request to compel the attendance of witnesses Daniel Landry and Chance James for cross-examination by Defendant. We find the current record sheds no light on Defendant's allegations or they are too general for a proper analysis. Therefore, they are deferred to the post-conviction relief process.

**F.    Supplemental Pro Se Assignment of Error No. 6**

Defendant contends the evidence presented to prove theft was insufficient to prove his guilt beyond a reasonable doubt. Referring to Faulk's testimony, Defendant argues that he was not identified at trial as the person who stole Dutsch's money. At trial, an in-court identification of Defendant was made by both Childs and Courville. Although Faulk did not identify Defendant in court during his testimony, the information provided to Faulk by Dutsch during the course of his investigation was sufficient to establish Defendant's identity as the person who stole her money. Next, Defendant contends the State did not prove he had the specific intent to commit theft. This issue was addressed in Assignment of Error No. 3 and found to lack merit.

Finally, Defendant contends that because the bill of information referred to the money as "lawful money of the United States of America," a circulating medium

of exchange was required to be proven and electronic or written checks, drafts, money orders, or other electronic instruments could not be included within this allegation. We note a conviction for theft requires anything of value be taken from the other person without that person's consent or by means of fraudulent conduct, practices, or representations. The bill of information indicates that money was taken. We find it unnecessary to determine whether the instruments listed by Defendant are lawful money or a medium of exchange. Although the subject of the taking were the funds in Dutsch's IRA account, they could have easily been liquidated into cash. This claim has no merit.

## G. Supplemental Pro Se Assignment of Error No. 7

Although Defendant was charged with violating subsection (B)(5) of La.R.S. 14:230, he challenges the constitutionality of subsection (B)(2) of La.R.S. 14:230, particularly the phrase "anything of value" contained therein. He contends (B)(2) renders the entire statute unconstitutional.

We note Defendant does not indicate in which of his many motions filed in the trial court this claim was raised. However, Defendant has no standing to challenge this portion of the statute:

> It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand. *United States v. Powell*, 423 U.S. 87, 92, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975); *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975); *State v. Boyd*, 97-0579 (La.4/14/98), 710 So.2d 1074. A defendant engaged in conduct clearly described in a statute cannot complain of the vagueness of the statute as applied to others. *Melugin v. Hames*, 38 F.3d 1478, 1486 (9th Cir.1994). A defendant may not establish that a statute is unconstitutionally vague by speculating about hypothetical conduct which could also be prosecuted under the same statute. *State v. Sandifer*, 95-2226, p. 10 (La.9/5/96), 679 So.2d 1324, 1331-32 (*citing City of Baton Rouge v. Norman*, 290 So.2d 865, 868 (La.1974)). Following this "as applied" rule, this court in *State v. Boyd*, held that the defendant's vagueness challenge to the phrase "requires medical attention" in the battery of a police officer statute was raised prematurely because "[w]ithout any facts before it, the trial court could

not determine whether the statute was applied unconstitutionally against defendant."

> In the instant case, given that the challenged statutes do not address First Amendment freedoms, the defendants must show that it lacks specificity to their own behavior and not to a hypothetical situation before they are entitled to relief. The transcript of the pretrial hearing reveals that at the outset of the hearing the State introduced into evidence two references to scientific documents about asbestos, a letter from the England Authority "relative to this proceeding, relative to the issue of asbestos," and a transcript of defendant Ducote's statement to a Louisiana State Police detective and an investigator from the Louisiana Department of Environmental Quality.

> The transcript also reveals that during the oral argument the parties made numerous references to the specific actions of the defendants and not simply to the speculative actions of some hypothetical defendant.

*State v. Hair*, 00-2694, pp. 5-6 (La. 5/15/01), 784 So.2d 1269, 1273.

### H.     Supplemental Pro Se Assignment of Error No. 8

Defendant contends his trial by a jury of twelve instead of six resulted in a violation of his constitutional rights. We note this issue was already addressed and found meritless.

### I.     Supplemental Pro Se Assignment of Error No. 9

Defendant claims on the second day of trial the prosecutor disclosed that he received an email showing that Defendant had no ownership of Commercial Business Loans, LLC, and that the business was fully owned and managed by Dutsch. He contends this would have exonerated him. However, he claims this paperwork, which was only mentioned in passing, was fraudulently withheld by the prosecutor. We find the current record is insufficient for a proper analysis of this claim. It is deferred to the post-conviction relief process.

### J.     Supplemental Pro Se Assignment of Error No. 10

Defendant points out numerous alleged acts of "judicial fraud" and "extrinsic fraud" he claims were committed by the trial court and the prosecutor. He contends

this "fraud team" cleverly and fraudulently deprived him of all his constitutional rights, a practice Defendant claims is pervasive in the Fifteenth Judicial District Court. Essentially, Defendant's claims boil down to allegations that the trial court and prosecutor had a personal interest in the case. We find the current record is insufficient for a proper analysis of this claim.

## DISPOSITION

For the reasons assigned above, Michael Calvin Duhon's convictions are affirmed, his sentences are vacated, and the case is remanded for resentencing. The trial court is instructed that if any periods of suspension of sentence and probation are imposed, it must specify to which count(s) they apply.

**CONVICTIONS AFFIRMED. SENTENCES VACATED AND REMANDED WITH INSTRUCTIONS.**